**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

PENNY JEAN MONROE,

                                                CASE NO. 16-12903
                *Plaintiff*,                     DISTRICT JUDGE GEORGE CARAM STEEH
*v.*                                            MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

                *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 15)**

## I.      RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence

supports the Commissioner's determination that Monroe is not disabled. Accordingly, **IT**

**IS RECOMMENDED** that Monroe's Motion for Summary Judgment, (Doc. 14), be

**DENIED**, the Commissioner's Motion, (Doc. 15), be **GRANTED**, and that this case be

**AFFIRMED**.

## II.     REPORT

### A.      Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of

Reference, this case was referred to the undersigned Magistrate Judge for the purpose of

reviewing a final decision by the Commissioner of Social Security ("Commissioner")

denying Plaintiff Jean Monroe's ("Monroe") claim for a period of disability and

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C.

§ 401 *et seq.*, and Supplemental Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 15).

On December 9, 2013, Monroe filed applications for DIB and SSI, alleging a disability onset date of September 19, 2009. (Tr. 130-44). The Commissioner denied her claims. (Tr. 56-83). Monroe then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on February 4, 2015 before ALJ Thomas L. Walters. (Tr. 26-55). At the hearing, Monroe—represented by her attorney, Charles Robison— testified, alongside Vocational Expert ("VE") Sandra Steele. (*Id.*). The ALJ's written decision, issued March 17, 2015, found Monroe not disabled. (Tr. 11-21). On June 14, 2016, the Appeals Council denied review, (Tr. 1-6), and Monroe filed for judicial review of that final decision on August 9, 2016. (Doc. 1).

**B.      Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . .

physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Monroe not disabled under the Act. (Tr. 32-46). At Step One, the ALJ found that Monroe last met the insured status requirements of the Social Security Act on September 30, 2014, and had not engaged in substantial gainful activity in the interval between her alleged onset date of September 19, 2009 and her date last insured. (Tr. 13). At Step Two, the ALJ concluded that the following impairments qualified as severe: osteoarthritis of the left thumb, osteoarthritis of bilateral knees, status post two right knee surgeries, migraines, degenerative disc disease of the cervical spine and degenerative disc disease of the lumbar spine. (Tr. 13). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 17). Thereafter, the ALJ found that Monroe had the residual functional capacity ("RFC") to perform light work except that:

the claimant can do no overhead reaching or lifting. She can occasionally bend, turn, crouch, stoop, climb, crawl or kneel. The claimant cannot walk greater than 150 yards at any given time. She cannot work around moving machinery or unprotected heights. The claimant would be on task at least 85% of the time.

(Tr. 17). At Step Four, the ALJ found Monroe incapable of performing her past relevant work as an animal care taker, cashier, or receptionist. (Tr. 19). But proceeding to Step Five, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . ." (Tr. 20).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has reviewed Monroe's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### i.    Function Report

Monroe filled out a Function Report that appears in the record. (Tr. 152-59). Describing her conditions, she noted impairment in "[l]ifting, walking for very long, standing for very long (within 30 min[utes] to 1 [hour] [she] start[s] to get leg cramps, syatic [sic] nerve starts to flare up, foot goes numb-prickly feeling ankle starts to cramp up. Memory loss, lose concentration at times. Have anxiety attacks that pop up without warning." (Tr. 152). This affected her sleep, as her legs and sciatic nerve would aft up while she was asleep. (Tr. 153). In a typical day, Monroe would "[g]et up" and "get on computer, feed my cats, dogs, eat lunch, fix dinner, watch late afternoon TV, watch

6

evening TV, read at night." (*Id.*). She did not take care of anyone else. (*Id.*). Her son, however, helped her take out the cat litter when the "bag gets full." (*Id.*). Before her illnesses, she was able to pet sit, groom animals, walk long distances, and lift heavy objects. (*Id.*).

As to her activities of daily living, Monroe listed difficulties dressing, bathing, caring for her hair, and shaving, as each required her to use her arms or legs in a manner that caused pain after a short amount of time. (*Id.*). She could prepare meals in the form of sandwiches or "anything that is quick [and] easy" on a daily basis, though it took between twenty and thirty minutes. (Tr. 154). She also retained the ability to do laundry and clean the house for "little bits a day" because "I know I'm going to hurt by the time I'm done." (*Id.*). Her husband did the yard work. (Tr. 155).

She would go outside "when the weather is nice," and could grocery shop once weekly for up to two hours. (Tr. 155). Her conditions did not interfere with her ability to pay bills, count change, handle a savings account, or use a checkbook or money orders. (*Id.*). Her hobbies included reading and watching movies, both before and after the onset of her conditions. (Tr. 156). Perhaps twice a week, she would visit friends and family at their homes to visit and talk. (*Id.*). However, since the onset of her conditions, "we do not stay as long . . . at family events because I start to get uncomfortable and start to hurt." Tr. 157).

Ticking off items affected by her conditions, Monroe marked: lifting, squatting, standing, reaching, walking, sitting, kneeling, stair climbing, memory, and using hands. (*Id.*). She elaborated, noting she could walk for thirty minutes before needing to rest for

at least ten minutes. (*Id.*). She could follow written instructions "OK," but could only follow spoken instructions "half and half." (*Id.*). She did not handle stress "very well" nor changes in routine unless "it does not last long." (Tr. 158). To ambulate, she used a cane "only when my knee hurts to the point that I can barely stand it to walk." (*Id.*).

### ii.       Monroe's Testimony at the Administrative Hearing

Monroe opened her testimony by noting that in her last job as a cashier at a pet supply store, the heaviest thing she needed to lift was fifty pounds. (Tr. 31). She worked for fifteen to twenty hours a week until her right hand began swelling and cramping up in September 2009. (Tr. 31-32). The ALJ then questioned her on her somewhat sporadic work history before her job at the pet store, including intermittent work as a pet sitter and brief stints as a receptionist and assistant at a veterinary office (for a few months) and as a housekeeper at a fitness center (for a day) in 2007 and 2008. (Tr. 32).

Moving forward, the ALJ noted that Monroe's weight and height at the hearing eked her into the "obese category," and asked whether that affected her ability to function. (Tr. 33). Monroe noted that "[i]t probably does not help my back [or knee]. That's the only thing I can think of." (Tr. 33-34). "I know they wanted me to lose weight if I could because of my knee." (*Id.*). Because she lives in a manufactured home, she needed to climb "three steps" to enter the front door, and required a rail to hang to when climbing. (Tr. 34). She indicated, however, that she could handle a full flight of stairs "as long as I take my time, use the rail." (*Id.*).

Monroe then provided a short overview of her medical treatment, noting she had to top seeing her treating physician for some years because her husband "lost his job and

we did not have insurance and I had to get the Obama Care and she did not go with our plan through that health care . . . ." (Tr. 35). Eventually, though, she was able to return to her treating physician. She underwent a "thumb surgery" sparked by her rheumatoid arthritis, but still suffered from "carpal tunnel" in both hands. (Tr. 36). Another surgery occurred in 2011. "When I was working at pet supply it was getting to the point the right wrist was swelling and the hand was cramping so bad I couldn't even turn a door knob and the left one was getting to the point, it wasn't as bad as the right but that was doing the same thing, cramping. My thumbs were not working right. Lifting things were really hard to do even with the cash register it was hard to manipulate, you know, on the keys. Like I said, when you're lifting that really hurt the hand and that's when I finally told the manager, I just, I can't do it anymore. I've got to go and see a doctor. So it really was painful." (Tr. 36-37). Her carpal tunnel began to act up within ten or fifteen minutes of being on the computer, and the pain traveled "up to my shoulder and numbness start[ed] in the tips of my finger." (Tr. 37). She still had problems "gripping with the thumb" on the left hand, which endured a mostly successful surgery. (*Id.*).

She also visited a physician for her acid reflux and GERD. The physician performed surgery on a "hiatal hernia" that interfered with the esophageal expulsion of acid reflux, which provided relief until "November 21, 2014" when Monroe "hit black ice and rolled a vehicle," after which the same problem began to stir and cause problems again. (Tr. 38).

Monroe indicated she could not walk a full block on "rough ground" and that standing straight sometimes made her "feel[] funny" due to her knee. (Tr. 39). In treating

9

her lower back, neck, right wrist, and face pain, Monroe started "physical therapy" involving manipulation of her back and spine. (Tr. 40). This, Monroe indicated, had caused further problems in her neck and face, notwithstanding the doubts of her physical therapist who told her "that she felt it had nothing to do with that, . . ." (*Id.*). She also described headaches on the "right side of the face" which "flare out" and "go into the side," hurting her teeth. (Tr. 41). But her worst pain remained in her "lower back up to the very middle, to the right side." (Tr. 48). These conditions interfered with her ability to carry out numerous activities of daily living, even if medication could "take[] the edge off" on occasion. (Tr. 45-48). They disturbed her sleep "every night" as well. (Tr. 47).

Asked if she had good days and bad days, Monroe indicated that she did not have "very many good days because of my lower back." (Tr. 41). She also noted that her depression and anxiety interfered with her ability to handle stress, and caused her to "cry" and "get upset a lot." (Tr. 42). Panic attacks occurred in the past, though not frequently. (Tr. 43).

### iii.      The VE's Testimony at the Administrative Hearing

The ALJ then began to question the VE as to Monroe's past work experience. (Tr. 51). She noted that the job "animal caretaker" qualified as "semiskilled with an SVP of 4" in the "medium exertional category," the job "cashier" qualified as "unskilled work with an SVP of 2 in the medium exertional category," and the job "receptionist" qualified typically as having "an SVP of 2 and light in exertion." (*Id.*). At this point, the ALJ asked the VE to assume a person with "a residual functional capacity for a range of light work" "further restricted by a requirement of no overhead reaching or lifting, only occasional

10

bending, turning, crouching or stooping, occasional climbing, crawling or kneeling, no walking beyond 150 yards at any given time during the day, no working around moving machinery, around protected heights. Based on those limitations would there be jobs that such a person could do?" (Tr. 51-52). The VE indicated there were, including jobs as a "general office clerk"—with 234,000 national availabilities—as a "packer" and "sorter"—with 325,000 national job availabilities—and as a "cashier[]"—with 1,150,000 national job availabilities. (Tr. 52). The minimum amount of time such person would be expected to stay on task is "[t]ypically at least 85 percent per activity over a period of an hour and then a day . . . ." (*Id.*). Anything less would preclude competitive employment. (*Id.*).

The ALJ next asked the VE "to assume that due to her impairments claimant would have sufficient bad days so that she would miss two or more days of work per month on a regular basis"—and the VE indicated that such a restriction would be work preclusive. (Tr. 53). A limitation to lifting less than eight to ten pounds would also eliminate the VE's suggested jobs. (*Id.*).

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence.

*Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic

12

techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

13

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish

14

the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human*

*Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Monroe puts forth two general arguments in her brief: (1) the ALJ failed to consider the effect of her obesity, GERD, sleep apnea, depression, anxiety, and migraines on her ability to work, imperiling the validity of his RFC assessment; and (2) the ALJ failed to find that Monroe's arthroplasty and knee arthritis met or equaled Listing 1.03. I consider each argument in turn.

### 1.    The ALJ Properly Evaluated Monroe's Impairments

Kicking off her argument, Monroe argues she "is obese and has several of the cormobidities that accompany that impairment" such as "GERD, sleep apnea and depression" which "all effect her ability to carry on her activities of daily living" and the "ability to work." (Doc. 14 at ID 833). In essence, however, the argument supposes that the ALJ's RFC is flawed because "he did not consider obesity" in crafting it. (*Id.*). To this, the Commissioner summarizes the ALJ's reasoning—noting along the way that the ALJ considered Monroe's allegations of sleep apnea, GERD, depression, anxiety, acid reflux, headaches, and memory and concentration problems, (Doc. 15 at ID 849-51)—and points out that Monroe "fails to cite any evidence demonstrating that she experienced limitations due to obesity . . . [thus] fail[ing] to carry her burden of establishing that she was limited by the condition," (Doc. 15 at ID 852).

SSR 02-1p explains that obesity is "a medically determinable impairment" as well as "a risk factor that increases an individual's chances of developing impairments in most

body systems," which "may also cause or contribute to mental impairments" in ways "subtle" or otherwise. 2002 WL 34686281, at *1, *3 (S.S.A. Sept. 12, 2002). It "remind[s] adjudicators to consider its effects when evaluating disability" and that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id.* at *1. The ruling "does not mandate a particular mode of analysis. It only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Blesdoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006). Even so, case law suggests that where a claimant alleges that her obesity causes work-related limitations on her application or at a hearing, failure to consider it may constitute reversible error. *See Oaks v. Colvin*, No. 13-CV-917-JTC, 2014 WL 5782486, at *9 (W.D.N.Y. Nov. 6, 2014) ("[W]here the record contains evidence indicating limitation of function due to obesity, the ALJ must consider the effect of obesity on the claimant's ability to do basic work activities at steps two through four of the sequential evaluation process."); *cf. Long v. Colvin*, No. 14-5189, 2015 WL 7012852, at *2 (W.D. Ark. Nov. 12, 2015) ("Given the medical evidence, which fails to establish obesity caused work-related limitations, and Plaintiff's failure to allege the obesity as a disabling condition on her application or at the hearing, the ALJ's decision is not reversible error.").

As an initial matter, I note that Monroe did not even allege limitations arising from obesity in her claim, and though she referenced vague difficulties with it at the hearing, the ALJ considered her allegations not credible. (Tr. 18, 33-34). The medical record provides, at most, scant traces of obesity over time, including evidence that Monroe was

17

*not* obese at certain points. (Tr. 285, 537, 627, 636, 642) (describing Monroe as not obese); (Tr. 388, 395, 428, 445, 613) (observing that Monroe *appeared* obese). Further, and as the Commissioner notes, Monroe points to no medical evidence she suffered work-related limitations from obesity. *See generally* (Doc. 14 at ID 818-24) (recounting myriad medical opinions relating to Monroe's conditions, none of which mention obesity). To find error in the ALJ's decision to omit discussion thereof would flip the applicable burden. *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994) ("Claimant bears the burden of proving his entitlement to benefits."); *Pokluda v. Colvin*, No. 1:13-cv-335 (GLS/ESH), 2014 WL 1679801, at *8-*9 (N.D.N.Y. Apr. 28, 2014) ("Pokluda did not claim disability based on obesity. Also, no medical source diagnosed Pokluda's obesity as a distinct medical condition, nor did any medical source find or opine that Pokluda's obesity is a significant factor relative to her ability to perform basic work activities. Pokluda's brief . . . identifies no discrete item of evidence documenting [any present] effects . . . . Under these circumstances, ALJ Mandry was under no duty to discuss Pokluda's obesity, and the omission of that discussion was not error."). The ALJ, therefore, made no error in not discussing Monroe's newly alleged obesity.

The ALJ likewise sufficiently discussed Monroe's other allegedly disabling conditions. The record contained evidence suggesting, for instance, that her sleep apnea did not cause nearly as many issues as she implied. *E.g.* (Tr. 448). Monroe repeatedly denied symptoms from anxiety and depression, *e.g.*, (Tr. 306, 387, 392, 457, 479, 493, 547, 645, 654), as well as suicidal ideation, (Tr. 421, 429, 434, 449, 461, 473, 505, 645).

Despite complaints of extreme pain among her medical notes, other notes documented low pain and observed that "[s]he is quite dramatic and seems to show a lot of subjective complaints based on the physical findings." (Tr. 314); *see also* (Tr. 461) (recording low pain). The record likewise failed to show any significant gait impairment, as the ALJ noted. *E.g.*, (Tr. 19); *see* (Tr. 303, 404, 449) (no gait abnormalities); *see also* (318) (normal range of motion); (Tr. 303-04, 307, 309, 321) (normal strength). Indeed, much of the evidence hinting at greater severity in her conditions arise from Monroe's own testimony both at the hearing, (Tr. 33-34), and to medical sources in the record, (Tr. 419), which the ALJ found not entirely credible, (Tr. 18)—and Monroe fails to challenge the ALJ's credibility finding.

For these reasons, the ALJ's consideration of the medical evidence was sufficient, and Monroe's contention that it warrants remand lacks merit. *Cf. Feliciano v. Colvin*, 2015 WL 5124046, at *5 (M.D. Tenn. Sept. 1, 2015) (finding no error where the claimant did not allege disability on the basis of a cervical impairment and the ALJ found a different impairment severe, so proceeded in his analysis).

### 2.    The ALJ's Consideration of Listing 1.03 Is Satisfactory

Monroe's second objection posits that her "arthroplasty and resulting knee arthritis meets or equals the criteria of Listing 1.03[.]" (Doc. 14 at ID 835). The prime reason offered for this contention is that Monroe's "ability to ambulate *effectively* had not returned by the date of the hearing – more than one year after surgery." (Doc. 14 at ID 839) (citing Monroe's testimony at (Tr. 38-39)). The Commissioner suggests, in response, that "the evidence overwhelmingly shows that [Monroe] maintained the ability

to ambulate" and as a result, "any error the ALJ made in failing to articulate findings at step three is harmless." (Doc. 15 at ID 852).

Listing 1.03 requires Monroe to demonstrate that she underwent "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App'x I. The regulations further define "inability to ambulate" as:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . . To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* 1.00B2b(1)-(2).

The Commissioner correctly notes that little evidence supports the notion Monroe suffered an impaired gait. *E.g.*, (Tr. 303, 404, 449) (finding normal gait); (Tr. 318, 550, 636-37) (finding non-antalgic gait with normal heel-to-toe walk). A quick glance at the ALJ's opinion shows *not* that he did not engage in a Step Three analysis, but rather that

he simply placed the analysis directly *above* his articulated finding, rather than directly below, as is more common—this certainly discloses no error. (Tr. 14-15) (discussing the medical evidence relating to Monroe's spinal deformities and osteoarthritis, including mention of her x-rays, MRIs, and surgeries).

Even assuming one could find error in the structure of the ALJ's opinion, such error would be harmless: he cited and discussed other evidence relating to Monroe's gait at length in separate parts of his opinion—(Tr. 18) (granting Dr. Choi's opinion that Monroe could "not walk greater than 150 yards" great weight); (Tr. 19) (discussing December 2013 radiographs demonstrating "a well aligned stable total knee arthroscopy without evidence of prosthetic loosening or infection"); (*Id.*) ("In July 2014 . . . the claimant had normal bulk, tone, sensation and strength in upper and lower extremities."); (*Id.*) ("The claimant reported her right knee felt really good. In July 2014 and January 2015, the claimant's surgeon noted the claimant's gait was nonantalgic and her right knee was stable in both flexion and extension to stress testing . . . .")—curing any potential defect in his supposed failure to include these reasons at Step Three of the analysis. *Accord Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) ("The ALJ did not err by not spelling out every consideration that went into the step three determination. The language of 20 C.F.R. § 404.1526 does not state that the ALJ must articulate, at length, the analysis of the medical equivalency issue. It states that the ALJ should review all evidence of impairments to see if the sum of impairments is medically equivalent to a 'listed impairment.' This is exactly what the ALJ did."); *see M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 859 (E.D. Mich. Mar. 21, 2012) ("While some authority suggests

21

that remand is justified based on this procedural lapse alone . . . this Court acknowledges that it may overlook the ALJ's failure to articulate his Step Three findings if the error is harmless in nature." (internal citation omitted)); *cf. Hoffmeyer v. Comm'r of Soc. Sec.*, No. 14-11690, 2015 WL 12670493, at *6 (E.D. Mich. Aug. 17, 2015) ("[E]ven assuming that this Court determines that the ALJ's step-three analysis was insufficient, remand would not be an appropriate remedy, as it is clear from the evidence set out above that Plaintiff cannot meet her burden to show that she satisfies Listing 1.04(A).").

The ALJ's Step Three determination is supported by substantial evidence—or, alternatively, the ALJ's error in not adequately discussing, in the appropriate context, why Monroe's conditions did not meet Listing 1.03—and thus Monroe's objection on this ground should not prevail.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Monroe's Motion for Summary Judgment, (Doc. 14), be **DENIED**, the Commissioner's Motion, (Doc. 15), be **GRANTED**, and that this case be **AFFIRMED**.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S.

140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991);
*United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that
making some objections, but failing to raise others, will not preserve all the objections a
party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human
Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local
231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy
of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.
Any objection must recite precisely the provision of this Report and Recommendation to
which it pertains. Not later than 14 days after service of an objection, the opposing party
may file a concise response proportionate to the objections in length and complexity. Fed.
R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each
issue raised in the objections, in the same order, and labeled as "Response to Objection
No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections
are without merit, it may rule without awaiting the response.

Date:  April 13, 2017                        S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 13, 2017                        By s/Kristen Castaneda
                                            Case Manager